IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 08-22549-CIV-MOORE/SIMONTON

SCHERRY THOMPSON,

    Plaintiff,

vs.

MIAMI-DADE COUNTY,

    Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court upon Defendant's Motion for Summary Judgment (dkt # 11).

UPON CONSIDERATION of the Motion, the Responses, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

**I.    BACKGROUND**

This case involves a claim by a former Miami-Dade police officer that his termination resulted from race based discrimination and retaliation. Plaintiff Scherry Thompson ("Thompson") joined the Miami-Dade Police Department ("MDPD") in 1996 and was promoted to corporal in 2005, working at the Hammocks District of the MDPD. In September of 2005, Thompson filed a complaint with the MDPD Professional Compliance Bureau ("PCB") alleging that his sergeant, Glenn Lester ("Sgt. Lester"), treated him in a racially discriminatory manner by telling him that he should report to the station quickly before Sgt. Lester pulled him by his beard, and that Sgt. Lester would make Thompson work for him as if he were "working for the Lesters"

or on "the Lester's Plantation."[1] Def.'s Statement of Material Facts ("Def.'s Statement"), ¶ 5 (dkt # 13); Personnel Hearing Transcript ("PHT"), testimony of Thompson, 229 (dkt # 13-1 through 4). PCB conducted an in-depth investigation of Sgt. Lester's actions.[2] PCB's investigation concluded that Thompson's allegations were "Not Sustained" based on a lack of supporting evidence. PCB Disposition of Personnel, 1-2 (dkt # 13-8). However, PCB, in a Disposition dated July 13, 2006, concluded that Sgt. Lester made discourteous remarks to others. Def's Statement, ¶ 6. Sgt. Lester received a formal counseling for his misconduct. Id. Thereafter, Sgt. Lester was transferred to another unit within the Hammocks District of the MDPD and no longer supervised Thompson. PHT, testimony of Thompson, 230.

In September of 2006, Thompson accepted a transfer to a field training officer ("FTO") squad to avoid potentially having to work with Sgt. Lester. Id. at 232-34. On October 11, 2006, Thompson was summoned to a meeting with Sergeant Diana Fuentes, the sergeant of the FTO squad; Lieutenant Mike Roy ("Lt. Roy"); and Lieutenant Alexander Diaz de la Villegas ("Lt. Villegas"). Id. at 234-35, 238. The participants of the meeting advised Thompson that it had come to their attention that Thompson had been making derogatory remarks about the FTO program. Id. at 235-36. Thompson was told that he could either sign a waiver of his right to 14

---

[1] Citations to the Statement of Material Facts incorporate the underlying citations by reference. With respect to facts in dispute, this Court will state the facts in the light most favorable to Plaintiff. This articulation of the facts does not constitute this Court's findings as to the veracity of the facts, but rather states the facts in a manner conducive to analysis on summary judgment.

[2] The PCB investigation relied on formal and taped statements by Plaintiff, Sgt. Lester, Lieutenant Arthur Gonzalez, and Officers Jorge Espinosa, Juan Aenlle, Evelyn Mendoza, Carlos Rodriguez, Zeida Cabado, Jill Brockmeyer, Alberto Martinez, Amira Atherley, and Thomas Kennedy. The investigation also took into account documents including: the Preliminary Complaint Report; Letter from Ricky Smith, dated October 18, 2005; Memorandum from Sgt. Lester to Plaintiff, dated July 7, 2005; and Intake/Release Medical Form from Doctor Lawrence Winston, for Plaintiff. PCB Investigation Report, Case No. P.C. 2005-0302, 15-16 (dkt # 13-7).

days of notice prior to being transferred to another squad or face the possibility of termination. Id. at 236. Thompson signed the waiver to avoid possible termination. Id. at 237-38.

Thompson reported to his new unit on October 17, 2006, under the supervision of Sergeant Pete Murias ("Sgt. Murias"). Id. at 238. On October 18, 2006, Thompson's patrol vehicle, which he normally used to commute to and from work, would not start. Id. at 241-42. Instead of taking his patrol vehicle to work, he drove his personal vehicle. Id. at 249. Because he did not have a patrol car, Thompson took a car that was assigned to Officer Janelle Daniels ("Officer Daniels"), who was not using the car at the time because she was on light duty. PHT, testimony of Daniels, 22-24. At some point during the day, it came to the attention of the Hammocks District that Officer Daniels' car was missing. Sgt. Lester put a call out over the police radio to find out who was driving Officer Daniels' vehicle. PHT, testimony of Thompson, 244-45. Thompson answered the call, stating that he was driving the car and drove the vehicle back to the station upon Sgt. Lester's instruction. Id. at 245.

Upon arriving at the station, Thompson overheard a conversation between Sgt. Lester and Sgt. Murias in which Sgt. Lester stated that he believed Thompson was driving a different patrol car because his assigned car was parked at one of Thompson's residences in Collier County, instead of in Miami-Dade County.[3] Id. at 246. An officer taking home a patrol car is required to keep it at the residence that he or she provides to the MDPD. PHT, testimony of Daniels, 19. Sgt. Murias took Thompson aside and explained that the command staff felt that Thompson was lying about his patrol car not starting and that they believed that the vehicle was in Collier

---

[3] During the time when Sgt. Lester was Thompson's supervisor, Sgt. Lester had also questioned whether Thompson was entitled to take home a patrol car because Thompson maintained residences at certain times in Miami-Dade County and Collier County. Id. at 247-48, 276-92.

County. PHT, testimony of Thompson, 248-49. After leaving for a moment to go the lieutenant's office with Sgt. Lester, Sgt. Murias returned and told Thompson that he and Thompson were going to go retrieve Thompson's patrol car to determine where it was. Id. at 249. Instead of going to Thompson's residence, Thompson directed Sgt. Murias to a housing community called Monterey Gardens. Id. at 284. Thompson explained that the car was parked at the house of a friend named Walter whose last name he did not know, and where Thompson had spent the night after a gathering. Id. at 286. The patrol vehicle started without incident and Thompson drove it back to the station. Id. at 304. After Thompson returned to the station, he asked Sgt. Murias if he could leave for the day because he didn't feel well and because he felt that the work environment had been hostile. PHT, testimony of Sgt. Murias, 39-40.[4]

Sgt. Murias advised Lt. Villegas that Thompson had been using Officer Daniels' vehicle. PHT, testimony of Lt. Villegas, 99. Lt Villegas was concerned that Thompson may have been using another officer's vehicle without the proper authorization. Id. at 100. Lt. Villegas instructed Sgt. Murias to conduct a review of Thompson's vehicle use. Id. at 100-01. The investigation led to a Disciplinary Action Report, drafted by Sgt. Murias, that drew the following conclusions:

1. Thirty of Thompson's Daily Activity Reports from July 31, 2006 to October 18, 2006, demonstrated that Thompson assigned himself Officer Daniels' vehicle without authorization.

2. Thompson drove a combined total of 9,527 miles using Officer Daniels' assigned vehicle and Thompson's assigned vehicle.

---

[4] Thompson subsequently requested leave from October 25th through November 4th and from Novermber 6th through the end of November, for issues related to stress and hypertension. PCB Investigator's Report, 8 (dkt # 13-8); PHT, testimony of Sgt. Murias, 40-41.

3. From July 10, 2006, to October 18, 2006, Thompson utilized his assigned vehicle toll card on 24 unauthorized occasions while off duty on local toll roads.

4. From September 8, 2006, to October 18, 2006, Thompson utilized Daniels' vehicle toll card on 16 unauthorized occasions while off duty on local toll roads.

5. Thompson's Daily Activity Reports from April 24, 2006, to October 17, 2006, demonstrated that Thompson had falsified the correct vehicle odometer readings by 10 to 80 miles on at least 13 separate occasions, as verified by comparing the use of the Cardless Fuel Transmitter with the mileage on the Daily Activity Reports.

6. On September 21, 2006, Thompson failed to submit a Daily Activity Report.

7. Between September 12, 2006, and September 13, 2006, fuel records demonstrate that Thompson dispensed 18 gallons of fuel into Officer Daniels' vehicle, even though only 20 miles were driven during this period.

8. Between September 22, 2006, and September 27, 2006, Thompson dispensed 21.8 gallons of fuel into Officer Daniels' vehicle, although no miles were driven during this period.

9. Between October 6, 2006, and October 11, 2006, Thompson dispensed 54.3 gallons of fuel into Officer Daniels' vehicle, although only 106 miles were driven during this period.

Disciplinary Action Report, 1-2 (dkt # 13-5). As a result of these infractions, Sgt. Murias' recommendation in the Disciplinary Action Report was that Thompson be terminated.

On October 25, 2006, Thompson filed a complaint with the MDPD's PCB, alleging that Sgt. Lester stated that Thompson was incompetent and that Lt. Villegas abused his authority by ordering Thompson to accept a transfer out of the FTO position or face possible termination. PCB Disposition of Personnel, 1-2 (dkt # 13-8). After an extensive investigation,[5] PCB concluded that Thompson's allegations were "Not Sustained," based on an absence of supporting evidence.

---

[5] The PCB investigation relied on formal and taped statements by Thompson; Sergeants Douglas Reese, Diana Fuentes, Pedro Murias, and Glenn Lester; Officers Janelle Daniels, Thomas Kennedy, and Juan Villalba; and Lieutenants Michael Roy and Alexander Diaz de Villegas. The investigation also relied on a litany of documents. PCB Investigation Report, 16-18, Case No. P.C. 2006-0393 (dkt # 13-8).

On November 6, 2006, Thompson utilized the Career Service Grievance Procedure to complain that he had been wrongfully removed from the Fto unit and that Sgt. Lester was harassing him by questioning him about his use of Officer Daniels' vehicle. Employee Standard Grievance, 1-2 (dkt # 13-9). On November 13, 2006, Thompson was advised that his grievance was denied because he failed to first raise the grievance with his immediate supervisor and because he failed to raise his grievances within seven calendar days of each incident, as required by Miami-Dade County Administrative Ordinance 7-18. Grievance Response, 1 (dkt # 13-10).

On November 8, 2008, Thompson filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that he was removed from the FTO unit on account of his race and in retaliation for filing a grievance.[6] The EEOC issued a Right to Sue Letter on June 17, 2008 (dkt # 13-17).

On March 23, 2007, Robert Parker ("Parker"), Director of the MDPD, terminated Thompson from employment at the MDPD. In a letter to Thompson, Parker stated that his decision to terminate Thompson's employment was based on the violations enumerated in the Disciplinary Action Report, Thompson's Personnel Record Summary, his past performance and his response to the Disciplinary Action Report. Letter from Parker to Thompson, dated March 23, 2007 (dkt # 13-14). The letter also advised Thompson of his right to appeal the decision within 14 days to the Director of the Miami-Dade Employee Relations Department. Id.

Thompson appealed Parker's decision and a hearing was held before an independent

---

[6] Thompson's EEOC charge suggests that he alleges retaliation against Sgt. Lester, Sgt. Fuentes, Lt. Roy and Lt. Villegas. However, Thompson's grievance concerning his removal from the Fto unit, which implicates conduct by Sgt. Fuentes, Lt. Roy and Lt. Villegas, was not filed until November 6, 2006, after his removal from the Fto unit. Therefore, Sgt. Fuentes, Lt. Roy and Lt. Villegas' conduct could not form the basis for a retaliation claim because Thompson filed his complaint against them after he was removed from the Fto unit.

hearing examiner selected by the American Arbitration Association. Thompson was represented by counsel at the hearing, which lasted two days, and Thompson had the opportunity to call witnesses and to cross-examine witnesses. See Personnel Hearing Transcript (dkt # 13, 1-4). On August 21, 2007, the hearing examiner issued a written opinion concluding that the County had proved the charges in the Disciplinary Action Report and that termination was proper. In the Matter of Personnel Appeal Between Thompson and MDPD, Case No. 32 341 0027407 (dkt # 13-15).

Pursuant to the County's civil service procedure, the hearing examiner's recommendation, along with the entire record, was submitted to George Burgess ("Burgess"), County Manager, for review. In a letter from Burgess to Thompson, Burgess stated that he had sustained the decision to terminate Thompson, based on the hearing examiner's findings and the entire record, including the hearing transcript. Letter from Burgess to Thompson, dated September 12, 2007 (dkt # 13-16).

## II.  STANDARD OF REVIEW

The applicable standard for reviewing a summary judgment motion is unambiguously stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. Twiss v. Kury, 25 F.3d 1551, 1554 (11th Cir. 1994). The moving party has the burden of meeting this exacting standard. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). An issue of fact is

7

"material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Id.

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. Id. However, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

### III.   ANALYSIS

Miami-Dade County contends that it is entitled to summary judgment on Plaintiff's discrimination and retaliation claims because there are no issues of material fact requiring resolution at trial.

#### A.   Race Discrimination Claims

Thompson alleges that his termination was racially discriminatory. "In order to prove a prima facie case of race discrimination an employee must prove that he was: (1) a member of the protected class; (2) qualified for the position; (3) subjected to adverse employment action; and (4) replaced by a person outside the protected class or suffered from disparate treatment because of membership in a protected class." Bolton v. Potter, 198 Fed. Appx. 914, 916 (11th Cir. 2006)

8

(citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). "[I]f an employer responds by producing evidence that there is a legitimate non-discriminatory reason for the challenged employment action, the employer will nevertheless be entitled to summary judgment unless the plaintiff can demonstrate that there exists a genuine issue of material fact that the reason given was merely a pretext for discrimination.[7] Id. This burden shifting analysis also applies to claims brought pursuant to the FRCA. See Howard v. Or. Television, Inc., 07-cv-35-Orl-19DAB (PCF), 2007 WL 3376796, at *2 (M.D.Fla. 2007).

Thompson's theory of race-based discrimination appears to proceed upon the theory that Sgt. Lester harbored racial animus towards Thompson, and that Sgt. Lester initiated an investigation into Thompson's vehicle use based on racial animus and retaliatory motives. However, no factual allegations have been made, and no evidence has been presented, that other members of the MDPD harbored racial animus towards Thompson or that Sgt. Lester was a final decisionmaker with respect to Thompson's termination.

"In order to hold an employer liable for the alleged discriminatory animus of an employee who is not the decisionmaker, the actual decisionmaker must merely 'rubber stamp' the recommendations of the biased employee, without any independent investigation." Barr v. City of Eagle Lake, No. 8:06-cv-1568-T-27TGW (JDW), 2008 WL 717821, at *9 (M.D. Fla. 2008). Under this type of "cat's paw" theory of liability, "a non-decision making employee's discriminatory animus may be imputed to a neutral decisionmaker when the decision maker has not independently investigated allegations of misconduct." Crawford v. Carroll, 529 F.3d 961, 979 n.21 (11th Cir. 2008) (citing Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998)). "In such a case, the recommender is using the decisionmaker as a mere

---

[7] The burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), applies to discrimination cases based on circumstantial evidence. Dwyer v. Ethan Allen Retail, Inc., No. 08-10005 (per curiam), 2009 WL 997008, at *1 n.2 (11th Cir. 2009).

conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." Id. (citing Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999)). Accordingly, Thompson's termination could only have been discriminatory if Sgt. Lester's racial animus can be imputed to a final decisionmaker.

Here, Thompson's claims of racial animus stem from his allegations that Sgt. Lester made discriminatory remarks to him and that Sgt. Lester's race-based animus was the catalyst for the investigation into Thompson's use of Daniels' vehicle that ultimately led to his termination. Assuming, without deciding, that there is a material issue of fact as to whether Sgt. Lester harbored race-based animus towards Thompson, the question is whether Sgt. Lester's animus may be imputed to a final decisionmaker who "rubber stamped" Sgt. Lester's recommendation. As an initial matter, there is no evidence that Sgt. Lester ever recommended that Thompson be terminated. While there may be a material issue of fact as to whether Sgt. Lester recommended that an investigation be initiated, if the investigation was carried out in an impartial and non-discriminatory manner, Sgt. Lester's race-based animus may not be imputed to a final decisionmaker who relied on the results of an independent investigation in concluding that Thompson should be terminated. See Dwyer v. Ethan Allen Retail, Inc., No. 08-10005 (per curiam), 2009 WL 997008, at *1 n.2 (11th Cir. 2009) (stating that the absence of an independent investigation is a component of a prima facie "cat's paw" discrimination case).

Sgt. Murias conducted the investigation into Thompson's vehicle use, which culminated with the Disciplinary Action Report. (dkt # 13-5). Sgt. Murias' investigation concluded that Thompson had committed numerous infractions relating to the use of his patrol vehicle and his use of Officer Daneils' patrol vehicle. Disciplinary Action Report, ¶¶ 1-9. There is no evidence that Sgt. Lester participated in the investigation or influenced the investigation in any way. Therefore, there is no issue of material fact that the investigation conducted by Sgt. Murias was

10

an independent investigation, untainted by any racial animus. After reviewing the results of Sgt. Murias' investigation in the Disciplinary Action Report, Thompson's Personnel Record Summary, his past performance and his response to the Disciplinary Action Report, Parker, Director of the MDPD, concluded that Thompson should be terminated. Letter from Parker to Thompson, dated March 23, 2007 (dkt # 14). There is no evidence that Parker's decision to terminate Thompson was influenced by Sgt. Lester's racial animus. Therefore, in light of Sgt. Murias' independent investigation, and Parker's explicit reliance on the results of the investigation, as well as on the other information referenced above, there is no issue of material fact that Sgt. Murias or Parker were not a conduit for Sgt. Lester's race-based animus.

Furthermore, Thompson appealed Parker's decision to terminate him. The appeal, conducted before an independent hearing examiner, constituted another independent investigation. The hearing examiner heard witnesses by both parties who were subject to cross-examination, and each side was represented by counsel. The hearing examiner concluded that the County had proved the charges in the Disciplinary Action Report and that termination was proper. Burgess, the County Manager, sustained the decision to terminate Thompson, based on the hearing examiner's findings and the entire record, including the hearing transcript. Letter from Burgess to Thompson, dated September 12, 2007 (dkt # 13-16). Therefore, in light of the hearing examiner's independent investigation, and Burgess's explicit reliance on the results of the investigation, as well as on the other information referenced above, there is no issue of material fact that the hearing examiner or Burgess were not a conduit for Sgt. Lester's race-based animus. Accordingly, summary judgment for Defendant is warranted on Thompson's discrimination claim because two independent investigations[8] were conducted and Sgt. Lester's

---

[8] Although two independent investigations were conducted, Sgt. Murias' investigation was alone sufficient to serve as an independent investigation free from the taint of racial animus.

race-based animus cannot be imputed to any final decisionmaker.[9]

Plaintiff also strongly contends that the conclusions of Sgt. Murias' Disciplinary Action Report were erroneous or were otherwise insufficient grounds for termination. However, an employer may terminate an employee for any reason, even if it is not good, prudent, or fair, as long as the reason is not discriminatory or retaliatory. Cordero v. Fla., Dept. of Env't Prot., 2008 WL 360962, at *1 (N.D. Fla. 2008) (citing Damon v. Flemming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) (stating that an employer may terminate an employee for any reason, whether good or bad, fair or unfair, prudent or imprudent, as long as the decision is not based on discriminatory bias). Accordingly, the fairness of the MDPD's decision to terminate

---

[9] Thompson, in his briefs, goes to great lengths to highlight the alleged disparate treatment of comparators. However, under these circumstances, the allegations of disparate treatment do not support Thompson's claims of discrimination or retaliation.

> In a case alleging age animus by a decision maker, disparate treatment of a comparator is relevant because it gives rise to the inference that the stated reason for taking the adverse employment action was pretextual. See Silvera v. Orange County School Bd., 244 F.3d 1253, 1259 (11th Cir. 2001). In a "cat's paw" case, an inference of pretext from disparate treatment only arises if a non-decision maker harboring [discriminatory] animus influenced the decision maker to take adverse employment action against a Plaintiff while taking less severe or no adverse employment action against the comparator. However, without other evidence that a non-decision maker influenced the decision maker's adverse employment action, no inference of pretext is warranted. When no animus is alleged on the part of the decision maker, the absence of evidence of influence by the non-decision maker on the decision maker's adverse employment action makes it impossible for disparate treatment to serve as independent evidence of [discriminatory] animus by the non-decision maker because there is no nexus between the disparate treatment and the non-decision maker accused of discriminatory bias. Likewise, evidence of disparate treatment cannot itself serve as evidence that the decision maker was influenced by a non-decision maker with discriminatory bias. While disparate treatment may suggest animus on the part of a decision maker, it does not inherently suggest that a neutral decision maker must have been influenced by a third party. Therefore, in a "cat's paw" case, disparate treatment cannot serve as evidence that a non-decision maker harbored discriminatory bias or that the decision maker acted as a conduit for the non-decision maker's [discriminatory] animus, absent other evidence suggesting that the disparate treatment was influenced by a non-decision maker.

Perez v. Saks Fifth Avenue, Inc., 592 F. Supp.2d 1388, 1399 (S.D. Fla. 2009). Here, even assuming there is evidence of disparate treatment, there is no evidence of influence upon a final decisionmaker by Sgt. Lester. Therefore, evidence of disparate treatment by Parker or Burgess cannot give rise to an inference of prextext, particularly absent any allegations that Parker or Burgess harbored racial animus towards Thompson or other evidence that Parker or Burgess were influenced by Sgt. Lester's race-based animus.

Thompson is not at issue here, in light of the fact that no discriminatory animus can be imputed to a final decisionmaker.[10] Therefore, summary judgment in favor or Defendant is warranted on Thompson's discrimination claim.

B. Retaliation Claims

Thompson alleges that Sgt. Lester initiated the investigation into Thompson's vehicle use in retaliation for the complaints Thompson made against Sgt. Lester for his racially derogatory comments. "Retaliation is actionable where 'a reasonable employee would have found the challenged action materially adverse, which in . . . context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Stone v. Geico Gen. Ins. Co., 06-15470 (per curiam), 2008 WL 2191777, at *2 (11th Cir. 2008) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (citation and quotation omitted)). "In order to state claims for discriminatory retaliation, a plaintiff must present evidence that: (1) he engaged in statutorily protected conduct; (2) he was adversely affected by an employment decision; and (3) there was a causal connection between the statutorily protected conduct and the adverse employment decision." Drago v. Jenne, 453 F.3d 1301, 1307 (11th Cir. 2006); see also Harper v. Blockbuster Entm't Corp., 139 F.2d 1385, 1389-90 (11th Cir. 1998) (stating that FRCA claims are analyzed using the same framework as Title VII cases).

"Only after the plaintiff makes this prima facie case of discriminatory retaliation does the burden shift to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." Id. "The presumption of discrimination is then rebutted and the employer is entitled to summary judgment unless the plaintiff proffers evidence sufficient to create a genuine issue of material fact that retaliation was actually the reason for the

---

[10] Thompson's procedural due process rights constituting notice and an opportunity to respond are not implicated here. See Cleveland Board of Educ. v. Loudermill, 470 U.S. 532, 546 (1985).

challenged action. See Kelliher v. Veneman, 313 F.3d 1270, 1275 (11th Cir. 2002). As described above, there is no nexus between Sgt. Lester's allegedly retaliatory conduct and Parker or Burgess's decisions to terminate Thompson.[11] Therefore, summary judgment in favor or Defendant is warranted on Thompson's retaliation claim.

## IV.   CONCLUSION

Based on the foregoing, it is

ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment (dkt # 11) is GRANTED. The Clerk of the Court is instructed to CLOSE this case. All pending motions are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 22nd day of April, 2009.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:   All counsel of record

---

[11] Thompson's Complaint (dkt # 1) also appears to allege retaliation by Lt. Villegas, Lt. Roy, and Sgt. Fuentes, for their roles in removing Thompson from the Fto unit. However, Thompson did not lodge complaints against these individuals until October 25, 2006, and November 6, 2006, after he had already been removed from the Fto unit. Therefore, Lt. Villegas, Lt. Roy, and Sgt. Fuentes roles in removing Thompson from the Fto unit could not have been retaliatory because Thompson had not yet engaged in any statutorily protected activity with respect to these individuals.